Good morning, Your Honor. May it please the Court, my name is Gail Ivins and I'm appearing this morning on behalf of the appellant, Terrance Baker. I wanted to start this morning just nailing down the chronology of what happened during the Terry Stott arrest, search, seizure. At ER 19-20, Volume 1, government counsel confirms that Officer Byam took the keys from Mr. Baker before any questions were asked about a car. I think that's really sort of the key factor in the analysis that follows with respect to whether the gun should be The government seems to rely on the idea that there was an abandonment of the key by his statement, but his statement came after the key was seized. And so, under Terry and Sibron, all of that action well exceeded the scope of any investigative stop. We learn in Terry and Sibron, if you're going to do an investigative stop, you can have a reasonable suspicion that someone is up to something, and I guess in this case, the reasonable suspicion is that Mr. Baker was trespassing. And so, you can do a pat-down search, which they did, and met with negative results. And at that point, you can ask questions to confirm or dispel your suspicion, the suspicion that he's trespassing. And so, one would think the questions you would ask are, why are you here? Who gave you permission? Who are you But none of those questions were asked. They weren't trying to confirm or dispel the suspicion that he was trespassing. They asked him about, you know, why didn't you give us this information about, you know, something about your gang activity earlier when we questioned you weeks ago. Do you have a car? And Ms. Sibrons, as I understand it, the seizing of the key was the way that the officers were able to locate or connect the car to him? Yes, you can see in the videos, you know, there are three videos that were submitted to the district court in support of the suppression motion, and those have been provided to this court. You can see in the videos the two different perspectives, one of Officer Salas, who is standing with Mr. Baker, and one of Officer Byam, I hope I'm pronouncing that right, I apologize if I'm not, who's the one walking around with the key. So, you can see him holding the key and walking around and checking out the cars in the parking lot until later he states that a Buick parked on the street had flashed when he clicked the key. So, I don't think there's any question that there was a but-for cause of them finding the car and then searching the car and finding the gun from the seizure of the key. And when Mr. Baker fled, how much time elapsed between his flight and his being captured or detained? You know, he made it about, you know, the way the housing complex was laid out, you know, there's one set of apartments and then there's two sideways sets of apartments and a big grassy area in between. He kind of made it to the end of that grassy area. I didn't time it, maybe like a minute, 45 seconds, minute and a half, I don't know, I'd have to time it, but it wasn't particularly long. And he lost the key fob in the midst of that chase? Officer Byam, while he was chasing him, apparently dropped the key fob, although it took him a while to admit that to his supervisor. When the supervisor showed up, there was some question about who had actually dropped the key fob. And Officer Byam was the one who had it in his hand and during the, you know, the chase of Mr. Baker when he, you know, inappropriately fled. So, the government argues that the flight itself attenuates, you know, even if there was an illegal seizure, that the flight attenuated or broke the chain of causation to the search of the car. What is your response to that? So, I think the cases are discussed in the brief in detail and I'm not sure I can recall every single detail while I stand here. But I think the critical fact is the thing that had to happen in order for them to find the car all happened before he ran. And so, unlike some of the cases discussed in the briefing where, you know, there was maybe an illegal action by the officers and then he ran, the defendant in that case ran and threw a backpack or threw a gun or threw something and that's how they found it. This was not attenuated in that way. All of that had happened before he ran. The seizure of the key and the clicking of the key and the finding of the car all happened before he ran. And so, attenuation is supposed to be something that, you know, breaks the chain. But the chain had already happened. The chain was sitting there on the sidewalk. It was finished. And then he ran and they got him, but they never found the key, but they didn't need the key because it had already flashed. Like that had already happened. If they had not taken the key as part of the Terry stop and for whatever reason down the chronology he ran and they arrested him and he still had the key on him because they hadn't taken it, could they have taken the key at that point? So search incident to arrest, if they had probable cause for an arrest for, I'm not sure what, on this fact pattern. Eluding an officer maybe. Maybe. I mean, and that's not discussed in the briefing, but I mean, not for trespass probably. I mean, that was rejected by the DA. Even the felon in possession was rejected by the DA. But if they had seized all of his property, they could certainly have seized the key incident to the arrest, but they would have needed a warrant to go into the car. I mean, that was clearly an illegal search of the car as well. He just doesn't have standing to raise that argument. And you concede he doesn't have, sorry. He does not have standing to directly raise the illegality of the police officer's search of the car. What he has standing to raise is the illegal seizure of the key, which was then used, you know, the fruit of the poisonous tree was them identifying the car. So, hmm. Because under Arizona v. Gantt, I've been thinking about this. Why doesn't this case get decided by Arizona v. Gantt? Because you have a warrantless search of the car, and the exceptions don't apply here. Mr. Baker was detained away from the car, so there's no safety issues. And there wouldn't be a search incident to that arrest, which was purportedly based on trespass, or even eluding an officer. Neither of those circumstances would justify a warrantless search of the car. So, whether he fled or not, you still needed a warrant in order to search the car. Is that your understanding? I mean, that's true, but he doesn't have standing to raise that argument. He doesn't have standing to search the car. He doesn't have standing, or at least they conceded in the district court. Maybe I would have come up with a different argument. I don't know. Or if they put in, as the government pointed out, if they had put in the mother's declaration saying, of course I gave my son permission to drive the car, then he would have had standing. But, you know, and I think that you can see on the video that they just, you know, they decide to search it because he had a key to it. So, in your view, if we're back to just the Terry Stoffer context, would there have been any grounds, could there have been any grounds for them to take the key from him? I mean, if they had arrested him, then they would have disposed of all, taken all of his property. We're just in the Terry Stoffer land. The frisk, stop and frisk. Is there any scenario in a stop and frisk context where they could have taken the key? No, because it's not a weapon. It's not an obvious gun, knife, anything that he can shoot with. I mean, so that's what they can see is obvious contraband or obvious weapons during a Terry Stoffer. That's what they can see. That's the scope, right? A Terry Stoffer is and that other one, Demetri, whatever it is with the D, the one where they, you know, they feel the stuff in the pockets, and like if they can tell what it is, they can reach in the pocket, but if they can't tell what it is, they can't reach in the pocket. I mean, that's sort of what happened here, except for it wasn't even in a pocket. They took something that was outside of a pocket, a key. Just, you know, you can see it in the key. So there is no, right, the Payton, I think it is, the Supreme Court case that specifically says, you know, any time you seize something from someone without a warrant, it is per se unreasonable unless there's an exception. And Terry doesn't have an exception for this. Can I ask, can I switch gears for a second to talk about prejudicial error? So assuming we agreed with you that there was an error in the admission of the firearm into the trial, can you discuss why it prejudiced him on all the counts? Because there seems to me to be quite a bit of evidence on the robbery convictions, at least. So there are three counts, right? He got acquitted, not acquitted, there was a hung jury on the bank robbery, and so that got dismissed. So we have three counts regarding the Sprint robbery. And with respect to the evidence that they have for the Sprint robbery, right, they have the testimony of the co-conspirator, Warren Beatty. And he was pretty heavily impeached. You know, he had had multiple gun counts that got dismissed as part of his deal with the government. So, you know, what we do with co-conspirator, co-defendant, you know, implicating testimony, I mean, I wouldn't say we give that like a ton of weight. So what they have are these Facebook photos that show a person whose face you can't see wearing a similar shirt to something in a Facebook photo, wearing similar pants to something in a Facebook photo. Contra to that, there was this discussion about whether he's left or right-handed. And one of the key pieces of evidence that the government relied on during the trial and in closing argument was this match, this physical apparent match between the gun you can see in the video, being held by the man in the video, and the gun that was seized from the car. And so with respect to the two counts that are not the gun count, right, that is certainly was a fact. But you also had evidence that he and the co-conspirator spoke seven times that evening right before the robbery. Yes, absolutely. And the directional cell phone data. Which is separately challenged, yes. And so, you know, you have all that, but the victim-victim, Brandon Smith, the not-the-co-conspirator, you know, he did not identify Mr. Baker. And so you don't have the non-complicit victim identifying him. And so the government relied pretty heavily, I think, and I've cited to all the places in the record in the briefing, on the fact that the guns match. They've got a pretty unique, apparently, I mean, the gun expert that they called talked about how it was a unique gun, and, you know, it had a special silver slide. I mean, they talked about that a lot, about how it was very, you know, different, special, and noticeable that they were the same gun. But at a bare minimum, as I say in my reply brief, with respect to the gun count, you can't convict him of a gun count without the gun. So that's 84 months of his sentence that I think if the court, if this court agrees that the suppression motion should have been a real gun, you can't say that that was a real gun in the picture. Unless the court has more questions, I'd like to save my three minutes for rebuttal. Okay. Thank you. Mr. Alden. Good morning, Your Honors. May it please the Court, Bram Alden for the United States. I want to start with a concession, which is that the officers should not have seized the Baker during this Terry stop. The government doesn't dispute that. Instead, we have three arguments that I set forth in my brief as to why that shouldn't be a basis for suppression and why the district court's decision on that should be affirmed. I'd like to take them in the reverse order of how I presented them in my brief, starting actually with harmlessness, which is, as to the actual Hobbs Act robbery count and the conspiracy count, the gun evidence was definitively harmless. The counts, as Judge Sanchez has pointed out, were supported by the CSLI, the cell site location information evidence, the phone calls between Baker and Beattie just before the robbery, the location of the phone moving up and down towards the site of the robbery, the clothing that matched, the testimony of the co-conspirator, which I don't think was so heavily impeached, but even if it were, it was corroborated by the digital evidence, and the photo of Defendant Baker holding a wad of cash six days after the robbery. On that basis, I think, even if the court disagrees with me on everything else, it should certainly affirm the convictions on the conspiracy and Hobbs Act robbery counts. It does seem that the co-conspirator testimony is probably the biggest or the strongest evidence, and Counsel for Baker has talked about, you know, he was impeached, and he has reasons why maybe you wouldn't believe him fully. The standard for harmlessness is beyond a reasonable doubt. Yes. So how do you get there? We get there because his testimony is completely corroborated by the phone toll records and the CSLI evidence, and there's no other suspect that could have committed the robbery. The only question really is who did it, and there's very good reason to believe that he was telling the truth. Indeed, he was threatened by Defendant Baker for telling the truth because he was called a rat, and Baker said, I know where your family lives. So when you take his testimony in combination with the records showing that they spoke multiple times on the phone and that Baker moved to and from the site of the robbery and that they then spoke afterwards, all of that together with the other evidence of the clothing match and the money shot on Facebook, the defendant posts, that shows beyond any reasonable doubt that the gun evidence, which was really especially as to the Hobbs Act robbery and conspiracy counts, just a blurry photo of a gun used in the robbery matched with the gun that is then recovered, that does, I think, cross the threshold. If the court disagrees, though, there still are the attenuation and standing arguments, and I would like to take the attenuation argument second, which is this case is very, very similar to McClendon, which is a case in which the court held that even if the officers had conducted an illegal search of a defendant's backpack, and even if that search had motivated them to then seek out the defendant, the fact that he kept walking when commanded to stop was enough of an intervening circumstance to then say that the evidence of the gun that he threw while walking away was sufficiently attenuated from the illegal backpack search. I guess why I'm having trouble with that is in McClendon, they witnessed him tossing the firearm, so there are characteristics of these flights that break that causal chain, whereas as counsel pointed out here, it was the seizure of the key that connected defendant to his car before there was any flight. There's nothing that I see about the flight itself that seems to attenuate. To me, and tell me if you disagree with this analogy, what difference would it make, could the police justify a search of his home based on him having fled? Because the car is just in some other location, what does the flight have to do with a warrantless search of a car or a home or somewhere else? So I think that actually the flight does contribute to the probable cause that is necessary to conduct a warrantless search of the car. Your Honor had raised the question of Arizona Vigant and what would be necessary to search a car without a warrant. Under the automobile exception, the officers would need probable cause, and I agree with defense counsel, Ms. Ivins, that defendant doesn't have standing to challenge that anyway, but officers, in order to establish probable cause to conduct a warrantless search of the car, had really two things they could rely on here. One was that they observed what appeared to be a gun appearing in the car through the window without actually opening the door of the car, and two was that the defendant had fled, and that flight contributes to the probable cause that would have been necessary to search the car without a warrant. But how would you have, how would the officers have ever found the car? I mean, they found the car because they took the fob. I agree with that, and I agree, I think that that is the difficult question, but that's where McClendon comes into play, which is that this court held that even if the backpack search was the reason the officers found the defendant, McClendon, in that case, they searched for him because they had illegally searched the backpack and found incriminating evidence. Even if that is what led to the finding of the defendant, the fact that he continued walking was enough to apply the attenuation exception. And otherwise, the court could look at this through the lens of the Brown factors, which the Supreme Court has enumerated, and we again concede one thing there, which is the temporal proximity is close. In fact, I would think that Ms. Ivins is being generous to the government in saying that the flight was a minute or a minute and a half. To me, the video is probably even shorter than that. It also seems pretty purposeful to me. The taking of the key, walking over, trying to get out of the car, detaining him longer, doesn't that suggest a purposeful attempt to find something without a warrant? I think the purpose and flagrancy factors should be a more broader perspective onto what the officers were doing in this whole instance, which is they were investigating a housing complex to protect residents who had been in a residence which had been the site of a lot of gang violence in recent days. They knew this was a gang stronghold. They knew there had been shots fired in the complex and around the complex and that there had been gang activity there. Their purpose in conducting all of these stops and asking questions of all of these men who were outside the complex was to protect the community and protect the safety of the residents of that complex. Beyond that, I think it is important that the FOB is lost during the actual chase and ultimately doesn't contribute to the opening of the car, which probably reduces the flagrancy of the misconduct. This wasn't a permanent deprivation of someone's property. It was taking a key, which admittedly again shouldn't have happened, but it wasn't a house search where you take over someone's home and search their whole house. It wasn't a cell phone search where you invade their intimate details and privacy. It was something a lot less substantial and significant than that. Then finally, the third argument is the standing argument, which as Ms. Ivins has conceded, defendant doesn't have direct standing to challenge the search of the car and he has the burden of proving standing. This is the one issue that the government doesn't bear the burden on and it wouldn't have been that difficult here for the defendant to have filed even his own declaration or his mother's to say she had lent him her car and he had a possessory interest. That is all that would have been required to establish that and prove his burden of standing. But isn't the important question here whether he had standing A, to challenge the Terry Stop itself and B, whether he had a possessory interest in the key? It seems as if the government's position amounts to a policeman can walk down the street and take a key from my neck or just hanging off of my belt and I can't challenge it unless I prove that I own the key itself, which would seem to flip the presumption against warrantless searches on its head. Just to be clear again, a policeman should never do that. All you would have to do in that scenario is either claim ownership or not disclaim ownership. I think that would have been sufficient. Even if a suspect or a target or someone whose key is taken doesn't say that is not my key, that probably is sufficient. And the reason the statement I don't have a car is akin to that is not my key is because officers do ultimately determine that this is the key to a car and the defendant is parked on site and he is disclaiming any ownership in a car. But what about Ms. Ivan's point that the key was seized before any words were spoken? That doesn't matter for the standing analysis. Ultimately, standing turns on whether he had a possessory interest in a car. So whether he said it before or after, you can't claim ownership of a key just as you couldn't in Veatch, this court held, that you couldn't, the defendant couldn't claim ownership of a wallet that the police recovered from the car where a defendant had been sitting and he said, that's not my wallet, excuse me. If a defendant says that is not my property, that is the abandonment theory that the government relies on to say he cannot claim standing and cannot claim an ownership interest. So then set aside possessory interest. What about the first point I was raising about the Terry Stop? He has a right to challenge the Terry Stop itself and whether evidence seized as a result of that stop was from fruit of the poisonous tree. Why doesn't he have standing on those grounds? I agree with you on that basis. He does have standing. And the reason that the Terry Stop wouldn't be a poisonous tree is because the government's position is the Terry Stop was permissible. So there is no poisonous tree from the stop. I mean, it was permissible in this, potentially permissible in the sense that they may have had reasonable suspicion to stop and frisk him. But didn't it exceed the scope once they knew he did not have a weapon to then take the key and start walking around and prolong the detention? I haven't heard any basis for any of those actions. And that's not really the claim on appeal. There's no prolonged detention claim that I could see. I think that the claim is they shouldn't have stopped him in the first place, which the government's position is they had the right to do that because of his potential trespassing or illegal gambling. And then beyond that, the taking of the key itself is the thing that he does not have standing to contest when he disclaims an ownership in that key or in any car and thereby the key. So ultimately, if this court disagrees on standing again, it should rule on attenuation or harmlessness and affirm the convictions on that on those bases. See, I have three minutes. Does the court have any further questions? Just one question about the obstruction of justice sentence. It's the government's view that there should we be looking at this under a clear error standard, whether the district court was clearly in erroneous in finding that this warning or message could have been delivered to him, even if not in person. I think that is the right standard, and I think the parties don't dispute that. There's really two standards in play here. One is that the district court only had to find that fact by a preponderance of the evidence to support the sentencing enhancement. And two is that in reviewing that finding, this court does look at it for clear error. And the defendant argues in his brief that there was a clear error here. The government's position is there certainly wasn't because Baker, excuse me, Beattie testifies quite clearly that the defendant communicated that threat to him. And it is a logical inference from the record that that communication came either in writing or more likely through a co-conspirator, Warren Philippus. But ultimately, we don't know, right? I mean, the record doesn't tell us how that message got communicated. Yes. And this court could only reverse if the record did, because the record, unless it's illogical, implausible, or unsupported by inferences that could be drawn from the record, this court has to affirm on a clear error standard. I mean, that's tricky for me a little bit, because the record tells us that the co-defendant says, I was threatened. Clearly, the district court believed that. The record also tells us that the co-defendant and Baker are not in the same housing unit, can't be a face-to-face communication, and then nothing else. We have no idea how it was actually passed. And I don't think that we need to know how the threat was communicated. We simply need to know that there was a threat and that the defendant made, or under the sentencing guidelines, counseled, induced, aided, and abetted sort of this threat. If it's made through Philippus, who is in the same housing unit as Beattie at that point in time, and who testifies that he had communications with defendant while in custody, that is a logical inference that can be drawn from the testimony that there was a threat made by defendant to Beattie. And the district court credited that testimony had the right to believe Beattie when he said repeatedly, both on direct and cross-examination, that it was Baker, the defendant, who threatened him to. Thank you very much. Let's see if I can remember everything I want to say. Number one, page 24 of the opening statement, United States v. Brown. And so that is a separate, independent argument about Fruit of the Poisonous Tree from the Exceeded the Scope of the Terry Stop, in addition to the Seizure of the Key. So those are two ways to get to illegal police conduct that resulted directly, Fruit of the Poisonous Tree and Seizure of the Gun. This is just not one of those cases where the cop said to him, is this your car, A. They asked if he had a car, and all that of course happens after the illegality. I mean, I think after the relevant things have all happened, this questioning about the car happens. But he doesn't have a car. His mother apparently has a car. So they didn't ask, did you drive a car here? I mean, I just, I think that all that's a red herring. All this stuff about him denying ownership of the car has nothing to do with the key. You can't just take, as your Honor said, you can't just take a key off of someone and that's okay, because later you then ask them, do you have a car? I mean, it just, that can't be the law. And the government appears to concede at least that part, that taking the key was improper. We know what the police were doing there, and you know, it's what the LAP does, and I'm not going to take a position on what the LAPD does to keep people safe. I mean, that's what they do. I do take a position on whether what they did can be introduced as evidence in a criminal trial. What they were doing at ER 774, we are tasked with gaining gang intelligence and monitoring gang-related activities. Well, that's what they were doing. I mean, that's pretty clear from watching the video. And maybe that's appropriate for police to do that. It's not appropriate then for what they get doing that necessarily to come into evidence at a trial. On the obstruction of justice issue, ER 203 to 209, Philippus testifies as to, you know, the conversation he had with the defendant, who says, I think Walter dropped a kite, and to him, Philippus, that's messed up how I did to him. That was the discussion. So on cross-examination, that was developed. And so the court has said that if you've got inculpatory statements by co-defendants, they need to be somehow corroborated. And this court has said, if you have two different people saying the same thing, that can corroborate it or something. But we don't have any of those situations here. And so I do think it's sort of a bridge too far to say that there was a preponderance of evidence that the court could base its finding on. And if the court doesn't have any more questions. No more questions. Thank you. Thank you, counsel, for your helpful argument. Baker v. United States is submitted.
judges: FORREST, SANCHEZ, Freudenthal